Chief Justice Watkins delivered the opinion of the Court. This is an application for a mandamus to the Judge of the Phillips Circuit Court in chancery, to compel him to grant an injunction upon the bill presented to him, his refusal being endorsed as required by the statute. The substance of the bill briefly stated, is that the complainants are the owners in fee of a plantation near the Mississippi river, about four miles south of Helena, including section 30 in township 2, south of range 5 east: that levees are necessary for the protection of these and other lands lying in the Mississippi bottom, as it is called, and that these levees sometimes have to cross bayous abounding in that region of country, emptying in the river, and which also serve as natural drains to carry off the rain-water falling on lands in the rear, which would otherwise flood the adjacent lands, and become stagnant, and be injurious to health, and an obstruction to the agricultural operations of the planters in their vicinity. That a water course known as Long Lake, which serves as a natural drain for large bodies of land including that of the complainants, and which runs through a portion of their cultivated lands, and in which there is, at all times, a current, though at low water almost imperceptible, was levied across in the months of July and August, A. D. 1852, by the Swamp Land Commissioners for the State of Arkansas, Cin-cinnatus Trousdale, Creed Taylor, an'd John W. Buckner, under the superintendence of one of their sub-commissioners, Boyd Bailey; that, in the construction of the levee, a wooden culvert was pat in the bed of the bayou so as to admit the free passage of the water through the levee, but that since the erection of the levee, the wooden trunk or culvert, owing to the pressure of the levee, or some other cause, has given way; and that one John S. Deputy, under the direction and supervision of the sub-commissioner, is proceeding to remove the dilapidated trunk or culvert for the purpose of filling up the levee solid, and so obstructed the flow and drainage of water in the bayou. That the levee crosses the bayou at a point from the lands of the complainants, on one side, to the land of Deputy, on the other side. That Long-Lake bayou, after pursuing a tortuous course, empties into the Mississippi twelve or fourteen miles below the plantation of the complainants. The bill proceeds to detail the effect and operation, as anticipated, of such a stoppage in the flow of the water in the stream, if so abstracted, and explains that while the effect would not be injurious to Deputy, because there is a drainage from his lands into Long Lake bayou, below the point where the levee crosses, it would be injurious to the lands of the complainants and others not so situated. And the complainants aver that the effect of the stoppage would be to overflow a large portion of their lands improved and unimproved, and to back the water up into one of their fields now in cultivation, destroying for agricultural purposes more than twenty-five acres of it, and to make a long and large pond about the centre of one of their fields; and, by the stagnation of the water, to prejudice the health of the adjacent country, including the plantation of the complainants, where they have more than seventy-five slaves. The bill further alleges that the levee commissioners, at a meeting of their board in October last, authorized the complainants to have an iron culvert or trunk made of suitable dimensions to permit the natural flow and drainage of the watercourse, to be placed therein where the levee crosses it, and prevent the injuries anticipated, and which they propose doing as soon as possible. The Swamp Land Commissioners, the Sub-commissioners and Deputy, are made defendants, and the bill prays for a decree that, in the repair and construction of the levee, the defendants be required to place in it a trunk or. culvert of sufficient size to permit the natural flow and drainage of the water, and that, in the mean time, and until the further order of this court, they be injoined from making the levee solid at the point described, and for general relief. Supposing the allegations of the bill, the substance of which we have stated, to be true, as upon an ex parle proceeding, we will consider them, for all the purposes of this application, to be sufficiently full and explicit. The levee complained of is being made under the act of the General Assembly to provide for the reclaiming of the swamp and overflowed lands donated to this State by the United States, approved January 6, 1851, and the supplemental act approved January 11., 1851, and is part of a system of public works, designed for the good of the whole people, but from which it must be supposed that some individuals will suffer partial loss or inconvenience. » By the third section of the act first mentioned, the powers and duties of the Swamp Land Commissioners are defined to be,,first, to fix the price of the swamp and overflowed lands, donated to the State of Arkansas by the act of Congress entitled, “An act to aid the State of Arkansas and other States to reclaim the swamp lands within their limits,” approved September 28th, 1850, in their present condition taking into consideration their locality, and the value that will be added to said lands by their reclamation, lists of which, with the valuation of each tract or legal subdivision, shall be forwarded to the Governor, subject to his approval or rejection ; second, to determine the locality, extent and dimensions of the necessary levees and drains, in order to reclaim said lands ; third, to district and classify said lands, and to let out the making of said levees and drains, by contract, to responsible persons at a stipulated price per cubic yard, to the lowest and best bidder. And by subsequent sections, they are required, by themselves and assistants of their own appointment in each county, to proceed immediately to ascertain and designate the swamp and overflowed lands granted to the State by the act of Congress, and they are also empowered to appoint sub-commissioners, to aid them in the location and construction of the necessary levees and drains, and in classifying and district-ing the lands. ■ The acts of assembly referred to, make no provision for compensation to persons, where private property is taken for public use in constructing levees or drains, although they seem to have contemplated that loss or injury to individuals might ensue, and by section 12 of the original act, and section 2 of the supplemental act, which are directory, the commissioners are required to construct the proposed levees as near as practicable to the bank of the river, or other water courses, and so that in all cases they shall follow the general course of the rivers, and be so located as to accomplish the largest amount of reclamation with the least injury and inconvenience to individuals: and the commissioners are directed, in letting out contracts for levying on the Arkansas river, to proceed with the work on both sides of the river, simultaneously, so far as practicable to afford equal protection to the cultivators and occupants of land on either side of the river. These are the only provisions bearing on the subject, and it is obvious, that in order to construct the levees and drains required, private property must be taken for public use, not only in respect of the ground occupied by the levee or drain, but where, in consequence of the levee, land of an individual is liable to be overflowed and rendered useless. Here, for instance, the land occupied by the levee complained of, might be inconsiderable, and of but little moment in comparison with other injuries directly resulting from it; and the overflowing of land adjacent, where it is a necessary consequence of the levee as constructed, is virtually a condemnation of it to public use. The complainants are not entitled to specific relief by way of injunction, except it be conceded that they would be entitled to damages at law, and that the remedy at law is not adequate. And the inquiry arises here whether the Legislature intended that the work of reclaiming the swamp lands should be effected without making compensation to individuals who might be injured by it, and if such was the intention, then the inquiry arises whether the Legislature have the power to take private property for public use without just compensation to the owner; because, if this be so, the complainants may be injured by the acts sought to be injoined, but it would not be an injury for which they would have a right to redress by suit, and their only remedy is, if such be the case, in entreaty or petition to the Legislature. The constitution of this State contains no provision that private property shall not be taken for public use, without just compensation; yet, we hold that this prohibition upon the Legislature, is implied from the nature and structure of our government, even if it were not embraced by necessary implication in other provisions of the bill of rights. The right of eminent domain is inherent in the government or sovereign power, and equally so is, or ought to be, in every government of laws, the vested right to his property in the citizen; and the right of eminent domain means that, when the public necessity or common good requires it, the citizen may be forced to sell his property for its fair value. The duty of making compensation may be regarded as a law of natural justice, which has its sanction in every man’s sense of right, and is recognized in the most arbitrary governments. To suppose that the Legislature, under our constitution, possessed the powes of divesting the citizen of his right to property without first providing in some equitable mode for ascertaining its value, and making him compensation for it, and could exercise this power without restraint, would be subversive of the government and equivalent to revolution and anarchy, since it would defeat one of the primary objects for which the government was established. It is certainly true that the General Assembly, in the appropriate exercise of its legislative functions, is to be considered as having the residuum of all sovereign powers not parceled out to any other department, and that it may pass all laws which it is not, expressly or by necessary implication, prohibited from passing by the constitution of the State or the United States; and it is not necessary, in the case now before the court, that we should question the existence of this power in the legislative department, though exercised against natural justice, or subversive of first principles. The preamble to the constitution of this State, declares the purpose of the people in convention assembled, to be, in the ordaining of a constitution for their government, to secure to them and their posterity, the enjoyment of all the rights of life, liberty, and property, and the free pursuit of happiness. The first section of the declaration of l’ights is, that all men, when they form a social compact, are equal, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty; of acquiring, possessing, and protecting, property’and reputation, and of pursuing their own happiness. And, it is further declared that, no man shall be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land. The last section declares that the enumeration of lights therein contained,"shall not be construed to deny or disparage others retained by the people. x Now we feel it our duty to express the opinion we entertain, that the prohibition upon the power of the legislature to take private property for public use without providing for just compensation to be first made to the owrier, is necessarilly implied in the articles above quoted. The right of the citizen to acquire, possess and protect property, thus guaranteed to all by the fundemental law, being a limitation imposed by the people upon the government of their own creation, and designed to pretect the weak against the strong, the minority against the majority, would be of little avail and but an empty sound, if the legislative department possesses the power to divest him of it without adequate compensation, through caprice, or even in the exercise of honest but misguided judgment, or, upon that most dangerous of all pretences, for State reasons, and the policy of promoting what may be deemed the public good. In Flecker v. Peck, 6 Cranch 87, the question was whether a grant from the legislature of Georgia, conceding it to have been obtained by fraud, could be annulled by a subsequent legislature so as to divest the title of an innocent purchaser who had acquired title from the original grantee without notice of the fraud alleged to have'been practiced upon the State. Although Chief Justice Marshall, in that case, rests his decision mainly upon the ground that the law in question was one impairing the obligation of contracts, inasmuch as, upon a fair interpretation of that clause of the Federal constitution, a contract executed or an estate vested was as well embraced in the prohibition as a contract executory or in action, yet in considering the extent of legislative power, he said, “If the legislature feel itself absolved from those rules of property, which are common to all the citizens of the United States, and from those principles of equity which are ac-knowleged in all our courts, its act is to be supported by its power alone, and the same power may divest any other individual of his lands, if it shall be the will of the legislature so to exert it.” And he said again, “It may well be doubted whether the nature of society and of government does not prescribe some limits to the legisl ative power; and if any be prescribed, where are they to be found, if the property of an individual fairly and honestly acqured, may be seized without compensation?” To the legislature all legislative power is granted, but the question, whether the act of transferring the property of an individual to the public be in the nature of the legislative power, is well worthy of serious consideration. It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments. How far the power of giving the law may involve every other power, in cases where the constitution is silent, never has been and perhaps never can be definitely settled.” In view of the distinction between the departments of the State Governments, repeatedly recognized and enforced by this court, the power of the government being divided by the constitution into three distinct departments, legislative, executive and judicial, and confided to separate bodies of magistracy, we are not called upon here to determine whether, if by law compensation be provided to the owner of property taken against his will for public use, the administration of the law in ascei^daiagasuid decreeing the amount of compensation, does li^T^^^A^^^belong to the judicial department. The qurati^r mode of making the compensation, bM j^o ere is notJas to the ivéá;;of with- ~ * in a w — holding it. The case of Gardiner v. The Village of Newburgh, 2 John. Chy. 162, was a bill to restrain trustees HiiS^aaart^fme legislature of New York, authorizing the constructionof certain waterworks. The act made provision for compensating the owners of the spring from whence the water was to be derived, and also the owners of land through which the aqueduct would pass, but made or contemplated no provision for compensating the complainant, who was the owner of land through which the water had been accustomed to run, off the line of the proposed aqueduct, which would divert the water used by himfor turning machinery. Chancellor Kent, admitting the right of eminent domain, said, “But to render the exercise of the power valid, a fair compensation must in all cases be previously made to the individuals affected, under some equitable assessment to be provided by law. This is a necessary qualification accompanying the exercise of legislative power in taking private property for public uses; the limitation is admitted by the soundest authorities, and is adopted by all temperate and civilized governments, from a deep and universal sense of its justice.” And he cites Grotius, Puffendorff, and Bynkershoeck, to prove it. to be a clear principle of natural' equity, that the individual, whose property is sacrificed for publie uses, must be indemnified, and quotes from Blackstone’s Commeiitaries on the law of England, to show that the sense and practice of the English Government are equally explicit on this subject. Chancellor Kent fortifies his opinion by reference to the constitutions of some' of the other States, where this principle of the inviolability of private property, even as it respects the acts and wants of the State, unless a just indemnity be afforded, had been made an express and fundamental article of right in their constitution of government, and more especially by reference to the clause of the federal constitution, “that private property shall not be taken for public use without just compensation,” as decisive of the sense of the people of this country. And he says “I feel myself, therefore, not only authorized, but bound to conclude that a provision for compensation is an indispensible attendant on the due and constitutional exercise of the power of depriving an individual of his property.” And, as it would seem, in accordance with the opinion of Chancellor Kent, a clause to that effect was expressly ordained in the constitution of New York, subsequently adopted. In the case of Crenshaw v. The Slate River Company, 6 Rand. 245, the constitutionality of an act of the Legislature of Virginia was called in question, arising out of a contest between the company incorporated for the purpose of opening the navigation of the river and the owners of mills who had erected dams across it. The court, delivering their opinions seriatim, held the act of the Legislature to be unconstitutional: Judge Caer considering it so when tested by the principles of all civilized governments; Judge GREen was of opinion that the owners of the property were not aided by the clause of the federal constitution inhibiting the States from passing any law impairing the obligation of contracts, because, though liberally construed, it had never been extended to the protection of private rights acquired under the protection of the general laws of the State, and without any consideration given, which would make their protection obligatory upon the State as a contracting party. And although he conceded that the Legislature had all the powers of sovereignty, except so far as they are limited by the constitutions of Virginia and the United States, he held the law to be unconstitutional, because of the clause in the Virginia bill of rights, which declaims “that all men are by nature free and independent, and have certain inherent rights of which, when they enter into a state of society, they cannot, by any compact deprive or divest then' posterity: namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.” And of this, he said: “to deprive a citizen of any property already acquired, without a fair compensation, deprives him, quoad hoc, of the means of possessing property, and of the only means, so far as the government is concerned, besides tljie security of his person, of obtaining happiness. Liberty itself consists essentially, as well in the security of private property, as of the persons of individuals; and this security of private property is one of the primary objects of civil government, which our ancestors, in framing our constitution, intended to secure to themselves and their posterity effectually and forever.” In the case of Bristol v. New Chester,3 N. Hamp. 534, this question was considered by the court as incidentally involved. The court there held, in the absence of any such provision in the constitution of that State, that, where private property is taken for public use, a just compensation is to be made. In the language of that court, “The constitutions of some of the States expressly declare that such compensation shall be made: and natural justice speaks on this point where our constitution is silent.” If the acts of assembly for reclaiming the Swamp Lands, provided for compensation to those whose property might be injured or taken for public use by the levees or drains contemplated by those acts, the parties now seeking relief could not be heard, except to complain in respect of the due and just administration of the law awarding compensation. And although we will not conclude that, in passing those acts, the Legislature intended to take private property for public use without just compensation, but must suppose that if such injury to private rights had been anticipated, it would have been provided for, and some mode of compensation established by law, yet, in the absence of such provision, there can be no doubt, upon the facts presented, of the jurisdiction of Chancery, and the court will not hesitate to exercise it to protect the rights of the citizens, because the work is a public one, and the defendants are acting as agents for the State. If acting within the scope of their authority, a suit against the commisioners is, virtually, a suit against the State. Y et, as they defend under the law and their authority, the State is not .a necessary party, and, even if made a party, it might be that the only way to afford effectually the relief sought, would be to enjoin her agents or officers. Where the rights of the individuals claiming to be injured are not concluded by a just compensation awarded for the loss or injurying to his property, the agents of the State are liable in damages for the trespass or waste committed; and where this amounts to a nuisance liable to continue, or the damag.es from it are likely to be irreparable, an injunction may be granted to restrain the act complained of, or by decree the nuisance, if erected, may be abated. This jurisdiction is one inherent in the powers of a Court of Chancery. But it ought to be exercised with caution. Where the undertaking is of a public nature, .or where great expense has been incurred, if of a private nature, an injunction to stop it will not be granted without a reasonable notice to the defendant; and then the chancellor may well hear affidavits in support .or denial of the allegations of the bill. See the remarks of Lord Eldon, in Crowder v. Tinkler, 19 Vesey 632. Of course, in cases where the injury may be immediate and destructive and thus irreparable, or where the giving of the notice might precipitate the act sought to be enjoined, no notice of an application for special injunction ought to be required. But this is not such a case. Here the injury may only be temporary and the levee, even if .completed, may, if the case made out require it, be opened and the nuisance abated. The chancellor, upon the facts alleged or shown, may mould the temporary, as he would the final relief, granting less than the prayer and within its scope. Here, he might order that the defendants desist unless within a reasonable time to be allowed, they would put a suitable culvert in the bayou; and from the affidavits adduced on the application, he could ascertain, with reasonable certainty, the amount of damages that might result to the defendants from the granting of the injunction, and so fix the amount of the bond to be given by the complainants, and prescribe its conditions to meet all the exigencies of the particular case. We are not insensible to the responsibility that might thus devolve upon the chancellor in the exercise of his judicial discretion. To open, or require to be kept open, a gap in the connex-ion of a system of levees, along the banks of one of our large rivers, might occasion wide spead injury or ruin to a great number of individuals, whose loss, compared with the injury or nuisance complained of, would make it appear trifling and inconsiderable. Although under peculiar circumstances, the existence of such a vis major or inevatable necessity would require the destruction of one man’s property in order to preserve that of others, yet, when the right of the complainant is clear, and the threatened loss or injury to his property is manifest, the courts are bound to afford him the protection of the paramount law requiring a just compensation to be made before his property shall be taken for public use. The bill in this case, taken most strongly against the pleader, concedes that the levee is being constructed with the consent of the complainants, and that it will be, if properly constructed, of benefit to them. And the gist of the complaint is, the want of a suitable culvert to permitthe usual flow of waterfrom the bayou into the river, and to shut out the overflow from the river when required. The complainants allege that they were authorized by the commissioners, in October last, to procure and put in the bayou, where the levee crossed it, a suitable iron culvert. We may, and ought to suppose, in the absence of any showing to the contrary, that sufficient time elapsed to enable them to procure this culvert; and, if so, the injunction was properly refused. Upon the whole' bill, as presented, and without any notice of the application being given to the defendants interested, we will not grant the mandamus asked for; but we have thought it proper, in stating the reasons for our opnion, to indicate, with some degree of certainty, what the action of the chancellor ought to be, in case the complainants shall deem it necessary, for the protection of their rights, to present their application anew. Note.-The petitioners presented their applications anew to the Chancellor; and, upon his refusal to grant an injunction, again applied for a writ of mandamus, which was awarded by the Chief Justice in the recess of the court.